David Hunley, Plaintiff's Office, MSP Entities, LLC For my part this morning, I would like to note how the legal landscape has developed since we last addressed this court, and then I'd like to turn our attention to specifically what brings us here today. When these cases began, and not just the two against State Farm, plaintiffs were disrupting the status quo of the property and casualty industry, which treats Medicare Advantage very differently than it does traditional Medicare. The response was pretty brutal. At every opportunity, defendants hurled insults and questioned our motives, and some courts did the same. But since we last stood before a panel of this court, the tide has changed, and courts have been able to express what the plaintiffs and others have been saying from the start, that Medicare Advantage plans have the same protections as Medicare, that the burden to act is on primary payers, not on Medicare Advantage plans, and that most importantly, the enforcement of these actions benefits Medicare and the Medicare Trust Fund. The attacks by State Farm and others have been revealed not to be attacks on the MSP plaintiffs, but attacks against the law, against the Medicare Secondary Payer Act itself. The most significant recent development is the September 4th opinion in the ace American cases from the 11th Circuit. And that decision, authored by Judge Walker, sitting by designation from the 2nd Circuit, dispelled many of the most troubling arguments that the property and casualty carriers, like State Farm here, have been hurling against the plaintiffs again and again, since these lawsuits were first being filed over three years ago. But as this court knows from the issue, because of the amicus brief filed by the U.S. Department of Health and Human Services. In its opinion, the 11th Circuit and ace Americans said that the HHS amicus brief should be afforded skid more deference. And that brief from the Department of Health and Human Services took the property and casualty carriers to task, observing that defendants appear to misunderstand the regulations governing their payment obligations. But equally important, both the HHS brief and the ace American decision confirmed the vitality of United States versus Baxter International. And that brings us here to the issues in this case. That's important because the dual observations in Baxter, number one, that Medicare payers are in the dark about what primary payers have or have not done. And the second observation, that primary payers cannot willfully blind themselves to their primary payment obligations. Both of those observations are front and center in this case. So, let's get down to the details of what brings us before this panel today. The case before you here is on the entry of summary judgment order that should have never been entered. While so much has been said about the complexity of the Medicare statutes and regulations, and specifically the Medicare secondary payer provisions and their application to Medicare Advantage plans, the much simpler principles of summary judgment carry the day here. Did State Farm resolve all material factual disputes in its favor as a matter of law to extinguish the entirety of the plaintiff's cause of action? The clear and correct answer here is no. It's important to note that this case was on track for consideration and ruling on the plaintiff's class certification motion, but State Farm sought relief on the merits, even though merits discovery had not begun in a bifurcated discovery schedule that was set by the court. Now, front and center to this summary judgment motion is the first and favorite line of defense from State Farm and others in the industry in the history of this case, and that is to attack the plaintiff's standing to bring suit. This case shows how the basic principles of standing have been corrupted and misapplied here. The plaintiff's standing to bring a Medicare secondary payer cause of action against State Farm has not diminished by any measure since the filing of this lawsuit. Plaintiffs here, like all plaintiffs, must demonstrate that they have standing to seek their intended relief. And if there is one thing that I would ask that this panel take away from these arguments this relates to standing and to apply that to every question or issue that surrounds this idea of whether or not these plaintiffs have standing to pursue their Medicare secondary payment actions against State Farm. Mr. Hundley, can I share a reaction with you and get the benefit of your reaction? Sure. Judge McDade seems to me to have expressed some frustration with the way you all approach litigation. And the frustration is one that is noting a lack of diligence on the plaintiff's part, that there's nothing at all that prevents you from investing resources in identifying illustrative or exemplar claims. And instead what happens is the lawsuit gets filed, pressure is put on an insurer, an insurance company defendant because of the double damage provision in the private right of action. And at no point along the way have you in advance of the or C.S. or A.B. or D.E. or whoever the illustrative plaintiffs may be. And so it's really hard to review this case not through the color that comes through from the district judge's own experience with the litigation. And for the life of me, I don't understand why there's not more diligence put in to the lawsuit on the front end. I'm sure it's demonstrating Article III standing. Well, if I may react to those observations, I think that what clearly hasn't been conveyed to your honor is that there is quite a bit of diligence that goes into the lawsuit before it's filed. And that at the time that the lawsuit was filed, again, as Baxter observes, the plaintiffs are in the dark as to what's happening on the data. But we certainly have put a lot of effort into what we do know about our claims. It seems that you're in the dark because you choose to remain in the dark. I don't understand. If you're buying a bundle of receivables, what prevents you from before filing a lawsuit, looking at that bundle and demonstrating either through correspondence with medical providers, an underlying policyholder or medical patient, as the case may be, or otherwise, that there's either been a double payment or there's been an unreimbursed conditional payment. I don't see what stops you from doing that. Well, there's quite a bit that can be and is done even before filing suit. So, in this particular instance, presently, the MSP entities have detailed standard industry data for approximately 3.4 million Medicare beneficiaries. But prior to the filing of this suit and throughout the we have assessed it alongside of third-party sources to identify which of those 3.4 million beneficiaries were State Farm insured and which ones the expenditures were for State Farm covered events. And that's why in the discovery in this case, we presented and served on State Farm that detailed payment data of conditional payments for 945 State Farm insureds. I presented to help conceptualize the overall evidence in this case, a Venn diagram that shows where the overall universe of the evidence is in this case. And if I may, to answer your question, I'd like to share that with you. I'm hoping that I can do so here by way of Zoom in the way that I would have presented it if I were standing in front of you. Are you able to see that diagram? Yes. I can see it. Yeah, thanks. Okay. So, the larger circle that's depicted here is to depict what State Farm's claims data is. And the smaller circle to the left, as it's indicated, is the entire universe of MSP recoveries claims data. And eventually, in the end, when we reach merits and we compare those two data sets, the overlap in the middle is what's been identified here as the recoverable claims. But prior to the filing of the lawsuit, there are specific accident-related funnels of data because all we have is here. Everything that's on the State Farm side is unknown to us. And still, because of the progress of this case, it's unknown to us. But the smaller portion of this circle shows what we've identified prior to filing suit and what we've provided to State Farm, which is those beneficiaries of ours for which we've made conditional payments that are also for State Farm's insureds. So, the OD claim, which is depicted here as just the single dot within this circle, is one of the 945 beneficiaries that we've identified. And it's important to that those were identified very conservatively before we had the full discovery. If I could get in a word. To follow up, I guess I'm having trouble understanding why it's unreasonable for the district judge to ask you to come up with just one case in which your client has been injured before proceeding with this massive data search, in particular with respect to OD. And I was also, I know there's this debate about whether the physical therapy was or was not related to the accident. But I didn't see any real response from you all about State Farm's evidence to the effect that they had already paid their policy limits with respect to OD. So, to address the particular OD facts, which again, I think that that's missing the overall most important issue here, but understood. But the importance with regard to OD, and this again is related to the overall behavior of payback the Medicare Advantage plans first. And so, the issue as it comes down to, in terms of timing, with regard to OD's payments and reimbursements, are that at the time that Florida Healthcare Plus made its payments on behalf of OD, State Farm still had within the cover that loss that should have been paid to Florida Healthcare Plus and not to Florida Medical Center or to the physical therapy provider. And so, in the end, there is evidence as to what the Florida Healthcare Plus has paid and evidence as to what State Farm has paid. But because they paid the providers before reimbursing Florida Healthcare Plus, that's why there's still an issue of fact as to whether or not those obligations were fully met as it relates to OD. But again, I urge you to understand that the fate of OD is not the fate of the case. So, even if we assume, and I am assuming that for the purpose of the broader argument, that the plaintiffs will not recover any reimbursement on behalf of OD, it still does not change the fact that the plaintiffs standing to pursue this case is no different now than it was at the time that we filed the lawsuit. Let me ask you, Mr. Connolly, to look ahead. If we were to send this case back again, presumably there would be litigation of the class certification question, right? Correct. That's where we were. And each individual claim would seem to require the kind of scrutiny that the parties have already devoted to the OD claim. Is that correct? Well, I think that each individual claim would certainly be open to scrutiny and analysis as it relates to that claim. But in this way of previewing, I suppose, the judge, you're asking about what those rule 23 issues will be on class certification. It's our contention, which is well reflected in very voluminous briefing by both sides that was set to go forward, is that there are significant avenues by which the common issues, both for the plaintiffs on the whole, meaning the MA plans, and the conglomerate claims that comprise each Medicare Advantage plans claims to be resolved. Mr. Hundley, your claim regarding OD's physical therapy bills and the contention that it was the declaration of your nurse practitioner that you offered in support of an interpretation of the medical records. And Judge McDade disregarded that, and it strikes me as not an abuse of discretion to do so in the circumstances of this case. How do we contend with that? Or how do you contend with that, I should think? Sure. Well, I respect those observations. I respectfully submit to you, as we have, that Judge McDade wasn't in the position to be able to decide the factual issue as to whether or not the need treatment was related. In any personal injury or other similar case, the issue about whether or not a particular treatment is related to the underlying injury event is one for the trier of fact. Well, it was his role to decide whether this opinion is sufficiently reliable to be admitted in the case to determine standing. If this is everything that you were hanging your hat on, as a different panel of this court observed in the earlier iteration of this case, the companion case, this was your moment. And if the whole case for OD as an exemplar for standing purposes turned on this opinion of the nurse practitioner, then it has to be admissible, and the judge wasn't impressed with it. Well, there's... It's a determination of admissibility. Right. And that's where the district court and the plaintiffs disagree as far as whether it's a threshold evidentiary issue or whether it's a question of fact. But within the questions that you've posed are at least three different layers of things that are important here. One of which being that you mentioned the previous State Farm case and the idea of hanging your hat on a particular illustrative case. But it's very important for the court here to recognize that that was an observation as to the viability of that assignment agreement. And nothing in this particular case suggests that there's a problem with the Florida Healthcare Plus assignment agreement or any other... I don't know that you raised that argument. I know it's in your brief, but did you present that argument to the district court? And if so, where? That the assignment alone is enough for Article III standing purposes. I looked for it in your briefs and I didn't find it. Well, in response to State Farm's summary judgment motion, in support of our Rule 56D motion, in our motion to amend the complaint, your representation is that you advanced a freestanding argument, separate and apart from CS, separate and apart from OD, that your client's acquisition of the contracts, the assignment, was alone sufficient for Article III standing. And that there need not be any inquiry at all into an exemplar or an illustrative individual. Well, I'm not trying to make that particular representation even here today, Judge. There's certainly, as it relates to the demonstration, and again, it's important, demonstration of standing, we have to demonstrate what the nature of the injury is. And so it's not just simply we have an assignment agreement and therefore we get to sue. Part of that explanation or demonstration of our standing is the type of injury that's presented. I put in response to Chief Judge Sykes, you were making the point that it doesn't make any difference that Nurse Lama was struck. And the reason it makes no difference is because we have a valid assignment of receivables. Well, I don't think that that was my intent. My intent is it depends on whether we're answering the issue about OD specifically, or whether we're talking about the plaintiff standing on the broader instance. And so certainly for deciding if this was simply a summary judgment by which the result would be whether or not OD's claim was recoverable, then we have to decide on whether or not the evidence supporting the relatedness of that need treatment is related to the loss. However, we've said throughout our filings with the district court and consistently here that this case is not about OD. Although OD demonstrated standing at the time the complaint was filed, it's within the much broader evidence that has been put forward, and frankly, for which State Farm has remained silent about. They have had since January 19th of 2019, the same level of detail about 945 State Farm beneficiaries that they have about OD and have not suggested that they can, in the same way that they have with OD, launched a merits defense. Nor have they suggested that there is a problem with the underlying Florida Healthcare Plus assignment or with any other assignment. And those are what put us in the shoes of the Medicare Advantage plans. And that's the notion of what the plaintiff's standing is in this case. All right, Mr. Hunt, I have to end it there. Thank you. Okay, thank you. Mr. Gan, I'm sorry if I mispronounced your name earlier. No worries, Your Honor. My wife and I, we honeymooned in Tahiti where it was pronounced Gauguin, and I didn't make any objections there. I'm not going to make any objections here. So good morning, everybody. May it please the courts. Plaintiffs say that they are legal pioneers. And by definition, that means they want to expand current law, including the foundational concepts of standing. Plaintiffs have shown no reason to alter the law to allow their speculative debt collection. And plaintiffs cannot point to any facts establishing standing under any reasonable standard. Now, plaintiffs open their presentation by saying that there is a sea change or a change in the tides. State Farm respectfully disagrees with that. With regard to the 11th Circuit opinion that the plaintiffs celebrate, I note that there is a petition currently pending for en banc review, and there are some very compelling amici briefs that have been submitted in connection with that issue. But the point being is those issues are not these issues here. The issues here are fundamental concepts of standing. And there is no sea change. There is no change in tide on the issues of standing. So I will begin my discussion with the presentation on those key issues of standing. I will then refute plaintiff's contentions that State Farm's summary judgment was somewhat of a surprise and show that there was no abuse of discretion in denying the Rule 56D motion. I also discuss the failings of plaintiff's allegations regarding the OD claim and the unfounded assertions regarding State Farm's payment of bills. And finally, I will show that the trial court did not abuse its discretion in denying plaintiffs leave to file a fourth amendment complaint, or I should say a fourth complaint, a third amendment complaint, long after the amendment deadline had passed. So let's talk about standing. Again, plaintiffs are strangers to the cause of action they attempt to bring. Plaintiffs are a consortium of attorneys and litigation financing companies who have allegedly purchased assignments from MAOs or downstream entities and have downloaded some data. They have not reviewed key documents underlying their allegations, such as the actual medical records and correspondence of their exemplar beneficiaries. In this case, State Farm subpoenaed this information from the MAOs and the medical providers, proving plaintiff's allegations regarding their exemplar beneficiaries to be wrong. Now, this information was readily available to plaintiffs prior to the filing of the lawsuit if they chose to invest the time to investigate. However, that does not appear to be part of plaintiff's business plan. The trial court recognized the threshold standing issue early in this case, where plaintiffs were asserting that standing existed somewhere in the soup of their assignments. In response to the initial ruling dismissing the case for a lack of standing, plaintiffs offered two exemplar claims in an effort to establish standing. Plaintiffs now say, surprisingly, that there should have been no obligation to plead any exemplar claims, suggesting that as long as they allege that there was a valid claim in this soup of assignments, they've established standing. Plaintiffs' arguments, however, are contrary to the basic pleading requirements, and they contradict this court's prior ruling in MAO 1, which provided a roadmap the trial court adopted to end this case. The MAO opinion found plaintiff's exemplar was flawed and affirmed the trial court's ruling that plaintiffs failed to establish standing through their exemplar beneficiary. Mr. Gaughan, in your view, did plaintiffs raise the issue that it was sufficient for standing purposes to show nothing more than a valid assignment, that they hold a valid assignment of receivables? That argument came up on reply. I was surprised to see it. I don't believe they ever made that argument. Now, the premise of one of their initial complaints, which was completely bare bones, might have had that concept underlying it, but they quickly amended that on its own and never contested that issue. I think it was their second complaint that they identified an exemplar but didn't offer any facts. It wasn't until the second amended complaint and Judge McDade's ruling that you need to, you know, have some substantial showing standing that we saw the two exemplar beneficiaries. And the idea that just having a simple assignment establishes standing is not only wrong, but it's the first I've heard of it. Can I ask you, Mr. Gaughan, to explain to me the difference here between whether plaintiffs have standing on the basis of OD's claim and the merits of OD's, of the claim for reimbursement of money spent on OD? Right. So in order to have standing, plaintiffs need to show that they have an injury traceable to State Farm. Simply saying that we have a bunch of data, that we think somewhere in that data will prove a valid claim is certainly insufficient. And that's where the legal pioneering comes in. They would like nothing more than a ruling from this court saying that all you need is some assignments and some data and some conclusory allegations to establish standing, but that's not the law. But standing and merits are different, right? You can have standing to bring a claim that lacks merit, for example, because no money is owed because the treatments were for unrelated conditions, right? That's where I'm having trouble distinguishing between standing and the merits of that claim. Well, Your Honor, there's certainly overlap between standing concepts and merits concepts. I'm not going to disagree with you that there is overlap there. But in this particular instance, plaintiffs needed to show an injury traceable to State Farm. And the way they chose to do it was to identify two exemplar beneficiaries. And the facts alleged with regard to those exemplar beneficiaries turned out to be wrong. They were wrong initially with regard to CS because the assignment they obtained post dated the filing of the complaint. And by the way, when Mr. Hundley talks about these, you know, 900 or some odd claims on his list, he's not differentiating whether he obtained any of those assignments after the filing of this case. That wouldn't help him at all. And on that list of 945, you're going to find the CS claim and you're going to find the OD claim. And presumably, they were the best that plaintiffs were able to offer here. So Judge Hamilton, with plaintiff's structure, trying to establish standing, basically the foundation for this case based upon those two exemplar beneficiaries, it's then an obligation of plaintiffs to prove the facts that they've alleged in order to establish standing. And they could not do that. Those facts were incorrectly alleged. Mr. Gaughan, let me, if I could ask you to step away from the Medicare specific issues here. And as somebody who knows state farm well and litigation in this area more generally or business practices, I guess this problem of multiple medical insurance coverage for the same condition is rife throughout the economy, right? Yes, all the time, overlapping insurance policies and so on. How are those issues of multiple coverage and primary versus excess coverage handled in large volume within the insurance business apart from Medicare? So apart from Medicare, and let's focus on the type of coverage that's at issue here. In MA01, the type of coverage was state farm paying or defending an insured in connection with a bodily injury claim, where you can imagine there's a lot of different providers. The plaintiff's attorney usually has the key, if you will, to knowing what medical bills were incurred, who paid what. And obviously there's a negotiation that goes on in connection with how do you resolve those bills and those liens. With regard to the PIP coverages that are at issue here, and PIP coverages are under an automobile policy that requires state farm very promptly to pay medical bills relating to an automobile accident. That's what state farm does. State farm processes those claims submitted to it. And it is an ongoing and very massive process that it pays very quickly. And that's a good thing. Sort out priorities later, right? Well, in terms of sorting out priorities, Mr. Hungley would suggest that we need to stop our quick payment and try to identify an MAO to see whether they may have paid a bill. Instead, what we're doing and what the record shows with regard to ODCS and the Florida beneficiaries, we're paying these bills as they come in. And we exhausted with regard to OD, we exhausted with regard to the Florida beneficiaries. That's what we do. We pay, we pay, we pay. Now, if Medicare or an MAO were to make a request while we're making this payment that they be reimbursed, we would certainly assess that and pay that. In CS, for example, we paid a reimbursement request from Medicaid. And that was part of the bill process. But I have to say as a commentary, I'm very concerned, very concerned with plaintiff's advocacy here in terms of what they think state farm should do with regard to PIP claims. The insurance industry is obligated under their and plaintiff's suggestion that we need to stop and find an MAO doesn't make sense because we report under the Medicare rules. Medicare knows that we are there. I would also mention with regard to OD, the idea that the MAO there, Florida Healthcare Plus would have reached out to state farm to say, please pay this physical therapy bill relating to the knee. They would have never done that. And the reason they never did that is because they withdrew any claim for the knee injury when discussing that bill with OD's plaintiff's counsel. So the MAO reached out to OD's plaintiff's counsel and said, here are the bills we paid. We want to be reimbursed from you. The attorney said, now, hold on a second. I'm here to address any valid bills, but these bills relating to the knee, they didn't relate to an accident. And so we're not going to have anything to do with those. The MAO then reissued that request for reimbursement without any reference to the knee. Okay. But is there, if I can go back to the broader question, is there no broad answer? Is it just case by case managing one claim at a time? In essence, that is the case, Your Honor. I mean, it depends on, you know, what request for providers that are submitting bills to State Farm. And it all goes to, you know, State Farm paying until it's exhausted its limits. And by the way, Your Honor, that's exactly what the MSPA anticipated. To suggest that the MAO should be in some sort of priority experience when we're all working in tandem to do what we're supposed to be doing. State Farm is paying the bills. If State Farm pays those bills, then they're not the responsibility of the MAO. So for plaintiffs to suggest, because it's helpful to their legal pioneering business model, that the MAO should have some priority here and State Farm needs to figure out the existence of the MAO, that's contrary to working together to get these bills paid. Your Honor, I'd also like to address the statement from plaintiffs that they were in the dark with respect to their allegations. Respectfully, that was their choice. They didn't review the records that would be available from their own ass and oars. Remember, they're just downloading some data. And, you know, with their Venn diagram saying we've got some data, State Farm has some data, and there's probably some valid claims there. I mean, that's not a matter of diligence. A matter of diligence, especially when trying to establish standing with a few exemplar beneficiaries, is to identify whether these are valid claims or not. And the OD claim is particularly egregious because while this case was pending, plaintiffs wrote a letter to State Farm outside the boundaries of the attorneys and said, we want to be paid on the OD claim. State Farm wrote back, again, outside the purview of the lawyers and said, our limits have been exhausted with regard to OD. So next thing you know, there's a second beneficiary. The exemplar beneficiary is OD when plaintiffs had a letter in hand that said that State Farm had already exhausted its limits. So there was a reference to Judge McDade, you know, having some frustration. State Farm has that same frustration, and Judge McDade's frustration is completely justified. Now, with regard to choosing an exemplar beneficiary and also reflecting Mr. Hunley's concept that there's a change in tide, I want to emphasize again that there is no change in tide to the requirement across the country that has generally been adopted, and adopted in this case, or the MA01 case with this court, to show a proper exemplar. And there's also indication in this court as well, aside from the MA01 case, that having exemplar for the purposes of establishing standing could be a good idea. And I would reference your honors to Dansell versus Groupon. That's the case where there was a requirement that the removing party under CAFA allege an out-of-state exemplar to establish minimal diversity. Judge St. Eve wrote that opinion, and what was debated there was the defendant saying, well, it's a national class. There's bound to be someone that's diverse. You can just accept that on its face. The Dansell opinion said, no, that is not the case. You need to specifically allege the facts showing an out-of-state exemplar. Mr. Gone, I got a question for you about, you've made the point a couple of times, trying to get us focused on the fact that State Farm may have paid policy limits, may have paid $10,000. What I'm wondering about, it's a bit of a legal question. My understanding is that there's a Medicare regulation in 41124i, which the district court pointed to, I think, in one or another of its orders, maybe at the 12B6 stage, and that regulation says that a primary payer, here at State Farm, must nonetheless reimburse Medicare, even though it has already reimbursed the beneficiary or another party. So can you make sense out of that for me, the point that you're making with respect to the policy limits exhaustion vis-a-vis the way the regulations work? Right. So that regulation, if you read each and every clause, it appears to be focused on a very narrow circumstance, and that is when State Farm and the MAO, for example, or Medicare, pay the exact same bill and addresses that particular circumstance. And in fact, that was the theory that plaintiffs used to get beyond the pleadings in this case, when State Plaintiffs argued that, well, hold on a second, there could have been double payments here. And the court implicitly accepted that argument. We went to discovery. There's no double payments there. That section would not apply. But just briefly, your point is that in a world where there is a double payment, the regulation would require the primary insurer to reimburse for the that would have to apply. And I would say in this instance, none of those conditions happened because there wasn't a double payment here. Okay. Okay. Thank you. All right. Thank you very much. Your time has expired. Mr. Hundley, you had used all your time. You may have another minute to offer any concluding thoughts. Thank you, Judge. I just want to briefly say that there's a suggestion earlier that our position is that we need to do nothing other than present a valid assignment. And that hasn't been our position at all. In this case, with regard to the 945 State Farm beneficiaries, State Farm insureds, that we provided to State Farm six months before this particular motion was filed. Those come from 29 Medicare Advantage plans, 18 of which, to answer Mr. Gaughan's comment, were assigned before this original lawsuit. And for purposes of a summary judgment motion, it's incumbent upon State Farm to say that they've paid their policy limits or otherwise for each of those. What we have before us and what we've for which there had not been any reimbursement from State Farm. So we are in the dark as to whether or not there's more to the story for each of those individual cases, as we would be for the ones that go beyond that conservative list of 945 payments of which there's... So what information, excuse me, what information do you have about the other 972 people on that list? We have each and every expenditure. We presented them with the exact procedures, where they were provided, the provider information, every detail that's required under the industry that State Farm is used to processing every single day. They're reimbursement data in its day-to-day business. And that's what they received from us. And you can be guaranteed that they analyzed every line of that and yet have not said anything or, more importantly, for summary judgment, supported anything to show that on the merits, which is what they've presented, that they are entitled to judgment as a matter of law. Mr. Hundley, I can't help but observe one thing, and that is you're playing very loose with what you said in your brief. On page 11 of your reply brief, you argue, and I'm quoting, in a subheading, while an illustrative loss provides a general demonstration, plaintiff's standing is established solely through the assignment agreements. So I don't know how you can say that you've never argued that as you did 30 seconds ago. I don't have anything else. Well, the use of the word solely was not meant to overlook the injury component of standing. All right. Thank you very much. The case is taken under advisement. Thanks to both counsel.